# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| JOHNANNA BEAM, | : | Case No. 3:17-cv-372 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## DECISION AND ENTRY

## I.     <u>Introduction</u>

Plaintiff Johnanna Beam applied for Supplemental Security Income in December 2013, asserting she was not able to work a substantial paid job.  She was denied initially and upon reconsideration.  After a hearing, Administrative Law Judge (ALJ) Mark Hockensmith concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.  Plaintiff brings this case challenging the Social Security Administration's denial of her application for benefits.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), Plaintiff's Reply (Doc. #12), and the administrative record (Doc. #5).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Hockensmith's non-disability decision.

## II.     Background

Plaintiff asserts that she has been under a "disability" since April 1, 2008. She was twenty-nine years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 416.963(c). She has a high school education. *See id.* § 416.964(b)(4).

### A.     Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Hockensmith that she started working at Emerson Climate on January 4, 2016. (Doc. #5, *PageID* #127). Her friend from church, who had worked there for twenty-eight years, helped her get the job. *Id.* at 130. At the time of the hearing, Plaintiff worked nine hours a day, six days a week. *Id.* at 126. She ran seven different machines that make compressors. *Id.* She explained that the job is "very painful"; her body aches constantly; and it is difficult for her to stand all day. *Id.* at 126-27. And, it is "[v]ery stressful" because she has to figure out the right parts as quickly as possible while in pain. *Id.* at 127. When she is too slow, her supervisor screams at her, stands near her, and repeats "speed up" over and over again. *Id.* at 136. Two friends at work try to help her so that she does not get too far behind. *Id.* at 131.

In a little over four months, Plaintiff missed fifteen days of work because, "My health isn't the greatest, and … when your body just hurts so bad that you can't get out of bed, and you're depressed and your anxiety's out of control, it's hard to get out [of] bed

because of it. And when you can't get out of bed to go to work, you just lay there." *Id.* at 127. She was written up for missing ten days in the first three months (she was only allowed to miss seven). *Id.* at 128. She was warned that if she missed any more days, she would be fired. *Id.*

Plaintiff's "whole body hurts." *Id.* at 136. More specifically, she has constant neck pain. *Id.* at 135. She also has pain in her shoulder "from the arthritis shooting through the top of it because I use my arms all day long." *Id.* Her back hurts from having to pick up compressors all day. *Id.* at 136. Her wrist and thumb hurt from when her husband broke her hand; sometimes the pain is so great that she cannot pick up a compressor. *Id.* at 135-36. Additionally, her knees and legs hurt and her feet are numb. *Id.* at 136. She had a pain-management doctor but is getting a new one because he was a "quack." *Id.* at 137. Generally, Plaintiff has difficulty getting along with her doctors because "nobody wants to do anything about what's going on with me." *Id.*

Plaintiff has several other health issues. For instance, she has migraines every day. *Id.* at 136. She has COPD and uses an inhaler (but continues to smoke a pack of cigarettes a day). *Id.* at 137. Her doctors think she might have breast cancer because she has pain in her breasts and is sick all the time. They plan to do a biopsy. *Id.* at 136. There is also a spot on her uterus that her doctors think could be cancerous. *Id.* at 137. And, she needs surgery because her uterus and bladder are falling out. *Id.*

Plaintiff struggles with mental health issues. She sees a caseworker, therapist, and doctor at Darke County Mental Health. *Id.* at 131-32. She generally sees them once per month. *Id.* at 132. Plaintiff talks to her therapist about "[d]epression, anxiety, bipolar - -

just crazy." *Id.* at 133. In addition to counseling, she takes four or five medications. *Id.* at 132. Her husband has to help her remember to take them. *Id.* at 132-33.

If Plaintiff does not take her medication for ADD (attention-deficit disorder), she cannot concentrate or remember very well. For instance, if someone tells her something, she might not remember it five minutes later. *Id.* at 134. The more a person tells her, the more she will forget. Generally, her concentration and memory have gotten worse over time. *Id.*

Plaintiff also believes that her temper is getting worse. *Id.* When asked how bad it was, she responded, "It's pretty bad. I'll run you over with my car." *Id.* She sometimes gets so angry that she cannot control herself. *Id.* at 134-35. When Plaintiff's attorney asked for an example, she retorted, "Do you want me to go to jail?" *Id.* at 135. "Well, no …" he answered; he clarified that he was asking for a general example. Plaintiff's response was quite surprising: "I'm so stressed out right now, I'm ready to kill my husband, take him to Kentucky, put him in [INAUDIBLE] and dump acid on his body." *Id.* She provided another example related to work—"if a bitch don't stop talking about me, I'm ready to punch her in the face and send her clear across Sydney." *Id.*

Plaintiff lives with her husband and three children—ages ten, sixteen, and eighteen. *Id.* at 122. She is able to drive but not on highways (unless she absolutely has to) because she does not like semis next to her. *Id.* She and her friend take turns driving to work. *Id.* at 123. On days that she does not work, she spends the day sleeping. *Id.* at 136. She is able to wake herself up and get ready. *Id.* at 133. If she is not in pain, she is able to do chores around the house. *Id.* She struggles to manage her bank account

because she has "trouble keeping track of what's what." *Id*. Her husband takes care of household bills because he does not want her to mess it up. *Id*.

Plaintiff was in special education class all the way through school. *Id.* at 123. She has trouble with reading and writing. She cannot spell many words and has to use a dictionary or ask someone. *Id.* at 124. She can sometimes read a menu. *Id*. At work, she has to read parts and part numbers. *Id.* at 125. When she has trouble matching parts—and she does about three times a week—two of her co-workers help her. *Id.* at 126. She can add and subtract but she sometimes has trouble subtracting. *Id.* at 125. She cannot "times or divide at all." *Id*.

### B. Laura Long

Ms. Long testified at the hearing that she has been Plaintiff's case manager at Wellness and Recovery since October 2014. She usually sees her once per month. *Id.* at 139. They usually go over any upcoming appointments, review paperwork she has received, and fill out forms. *Id*. They also work on her coping skills. *Id*.

Ms. Long attends her doctors' appointments because Plaintiff sometimes has a difficult time understanding and remembering what was said. *Id.* at 140. Afterwards, Ms. Long reviews what the doctor said, simplifies the instructions, and writes them down. *Id*.

She tried to help Plaintiff find a job for over a year. *Id*. at 140. Unfortunately, since Plaintiff began working, her problems have gotten a little worse. *Id.* at 142. Ms. Long opined, "it's possible due to the added stress that she's been under, [] she's much more volatile and agitated and irritable." *Id*. at 141. Indeed, "[s]he gets frustrated quite a

bit at work, … there's been several instances where … she's actually … yelled at her supervisor … because of … not being able to [] manage the [] stress of the job." *Id*. Further, Ms. Long indicated that Plaintiff is generally able to get along with people until she gets frustrated. *Id*. "And then she usually will become very upset. It's … pretty immediate. She's pretty impulsive." *Id*.

### C.     Medical Opinions

#### i.     Christopher C. Ward, Ph.D.

Dr. Ward evaluated Plaintiff on April 22, 2014. *Id*. at 1698-1702. He noted that Plaintiff's conversational speed was slow, she sighed regularly, she had limited energy, and her testing speed was slow. *Id*. at 1701. She presented as depressed, her affect was flat, she maintained limited eye contact, and her facial expression was downcast. *Id*.

On the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV), Plaintiff obtained a Verbal Comprehension Index of 68, a Perceptual Reasoning Index of 71, and a Full-Scale IQ of 61. *Id*. at 1702. These scores indicate Plaintiff functions "well below average range of intellectual functioning." *Id*. Dr. Ward opined, "Her tested IQ is lower than what would be expected on the basis of her clinical presentation. This was due to inconsistent effort and her generally tired presentation." *Id*. He found that her history and presentation warranted the diagnosis of borderline intellectual functioning. *Id*. He also diagnosed major depressive disorder, recurrent with psychotic features, and unspecified anxiety disorder. *Id*.

Dr. Ward opined, "[P]laintiff did not perform adequately on a verbal reasoning test[] which suggests difficulty understanding instructions. *Id*. at 1703. Likewise, her

inadequate performance on working-memory and processing-speed testing suggests difficulty remembering instructions. *Id.* Plaintiff's depressed presentation may affect her level of engagement with coworkers and supervisors. Further, her below-average range of intellectual functioning suggests difficulty understanding and responding to supervisor requests and relating to coworkers in an adequate manner. *Id.* Plaintiff's depressive and anxious symptoms may compromise her ability to respond to work pressures and lead to increased emotional instability, conflicts, likelihood of agitation, and difficulties with breathing. Id. at 1704.

> ii. *Irma Johnston, Psy.D., Karen Steiger, Ph.D., Leslie Rudy, Ph.D., & Cynthia Waggoner, Psy.D.*

Dr. Johnston reviewed Plaintiff's records in March 2012. *Id.* at 194-207. She found Plaintiff had four severe impairments: affective disorder, anxiety disorder, personality disorder, and borderline intellectual functioning. *Id.* at 201. She opined that Plaintiff had a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in concentration, persistence, and pace; and no repeated episodes of decompensation. *Id.* at 202. Dr. Johnston concluded that she "retains the ability to understand and perform simple routine tasks in a setting which is relatively static without strict production quotas with occasional contact with others including coworkers and supervisors in a nonpublic work setting." *Id.* at 205-06.

In June 2012, Dr. Steiger reviewed Plaintiff's records and affirmed Dr. Johnston's assessment. *Id.* at 225-40.

Dr. Rudy reviewed Plaintiff's records a little less than two years later, in May 2014. *Id.* at 259-72. She found that Plaintiff had one non-severe impairment—anxiety disorder—and three severe impairments: fracture of left extremity, affective disorder, and borderline intellectual functioning. *Id.* at 266. She affirmed Dr. Johnston's assessment of the Listings 'B' Criteria. *Id.* Dr. Rudy opined that Plaintiff can understand and recall one-to-two step tasks and "appears able to carry out an ordinary routine of predetermined tasks on her own. She would need changes of any type previewed in advance and then gradually implemented to allow her time to accommodate herself to the new expectations." *Id.* at 268-70. When she is experiencing increased symptoms, she should have flexibility with her breaks and shift scheduling. *Id.* at 269. "She should not work a great deal with the general public, but should be able to work in small group settings of familiar coworkers where she has brief, conventional transactions. She can take constructive criticism on an intermittent basis from a supervisor." *Id.*

In October 2014, Dr. Waggoner reviewed Plaintiff's records and affirmed Dr. Rudy's assessment. *Id.* at 274-85.

        *iii. Gary Hinzman, M.D., Dimitri Teague, M.D., Gerald Klyop, M.D., & Frank Stroebel, M.D.*

In March 2012, Dr. Hinzman reviewed Plaintiff's records. *Id.* at 194-207. He opined Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently. *Id.* at 203. She could stand and/or walk for six hours in an eight-hour workday and sit for six hours. *Id.* She could occasionally climb ladders, ropes, and

scaffolds and frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. *Id.* at 204. Dr. Hinzman concluded that Plaintiff is not under a disability. *Id.* at 207.

Dr. Teague reviewed Plaintiff's records in August 2012 and affirmed Dr. Hinzman's assessment. *Id.* at 225-40. Likewise, Dr. Klyop (in March 2014) and Dr. Stroebel (in September 2014) reviewed her records and affirmed Dr. Hinzman's and Dr. Teague's assessments. *Id.* at 259-72; 274-85.

## III.  <u>Standard of Review</u>

The Social Security Administration provides Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741

F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.    The ALJ's Decision

As noted previously, it fell to ALJ Hockensmith to evaluate the evidence connected to Plaintiff's application for benefits. He did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 416.920. He reached the following main conclusions:

Step 1:     Plaintiff did not engage in substantial gainful employment from December 5, 2013 until January 4, 2016.

Step 2:     She has the severe impairments of residuals of left ankle fracture and corrective surgery; mild degenerative disc disease of the lumbar spine; borderline intellectual functioning; affective disorder with depressive features; and generalized anxiety disorder.

Step 3:     She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:     Prior to her return to work in January 2016, her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "'light' work … subject to the following additional limitations: (1) no climbing of ladders, ropes, or scaffolds; (2) no more than frequent climbing of ramps or stairs; (3) no more than occasional balancing, kneeling, crawling, or crouching; (4) no use of foot controls with the left lower extremity; (5) limited to performing simple, routine tasks; (6) limited to working in a static work environment with no more than occasional changes in the work setting; (7) no fast-paced duties or strict production quotas; (8) no contact with the public; (9) no more than occasional contact with co-workers or supervisors; (10) no duties requiring reading or math skills above a 6th-grade level; (11) no tandem tasks or collaborative work duties."

Step 4:     She is unable to perform any of her past relevant work.

Step 5:     She could perform a significant number of jobs that exist in the national economy.

(Doc. #5, *PageID* #s 80-103). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 103.

## V.    **Discussion**

### A.    **Listing 12.05C**

Plaintiff contends that the ALJ erred in finding that her impairments did not meet or equal Listing 12.05C, the listing for intellectual disability.  To meet Listing 12.05, an individual's impairment must satisfy the diagnostic description in the introductory paragraph and any of the four sets of criteria.  20 C.F.R. § 404, Subpt. P, App. 1, § 12.00.  Listing 12.05C provides:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> .    .    .
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

*Id.* § 404, Subpt. P, App. 1, § 12.05C.  Thus, a plaintiff seeking to establish an intellectual disability under Listing 12.05C must prove three elements: (1) an IQ score between 60 and 70; (2) a second impairment causing work-related limitations; and (3) subaverage general intellectual functioning with deficits in adaptive functioning that began before age 22.

Before addressing those elements, however, there is one general issue to resolve.  ALJ Hockensmith emphasizes, "The evidence documents, at worst, only borderline-range intellectual functioning rather than 'intellectual disability.'"  (Doc. #5, *PageID* #s 95-96)

("It is the consensus of mental health professionals that the claimant's intellectual functioning falls within the borderline range rather than in the range indicative of intellectual disability."). However, Listing 12.05C does not require a diagnosis of "intellectual disability." As the Commissioner is usually quick to point out—and is correct as a matter of law to do so—a mere diagnosis does not establish that a claimant is under a "disability." *See, e.g., Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986); *see also* 20 C.F.R. § 416.927(e)(1); *cf. Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."); *King v. Barnhart*, No. 1:06-cv-0381, 2007 WL 968746, at *5 (S.D. Ind. 2007) ("The Commissioner cites to *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001), to argue that a claimant must meet a formal diagnosis of mental retardation. *Foster* did not say that…").[1] Requiring such a diagnosis in cases of intellectual disability would place formalism over substantive evidence, especially where the plain language of Listing 12.05C does not specifically require a claimant to produce evidence from a medical source diagnosing intellectual disability. *See Whitehead v. Comm'r of Soc. Sec.*, No. 13-1231-T, 2014 WL 3952839, at *5 (W.D. Tenn. Aug. 13, 2014) ("Listing 12.05(C) does not require that a formal diagnosis of mental retardation be made ….") (citing *Thomas v. Comm'r*, No. 08-cv-1365, 2010 WL 1254788 (N.D. Ohio

---

[1] On August 1, 2013, the Social Security Administration amended Listing 12.05 by replacing the words "mental retardation" with "intellectual disability." *See* 78 F. Reg. 46,499, 46,501 (to be codified at 20 C.F.R. § 404, Subpt. P, App. 1). The Administration stated that the change "does not affect the actual medical definition of the disorder or available programs or services." *Id.* at 46,500. Thus, the amendment does not effect a substantive change, and in relation to Listing 12.05, the words "mental retardation" have the same meaning as "intellectual disability."

March 25, 2010); *Lowes v. Comm'r*, No. 12-13077, 2013 WL 4413751 (E.D. Mich. Aug.

15, 2013)).  Thus, instead of requiring evidence of a diagnosis, the correct analysis

focuses on whether the evidence of record meets or equals Listing 12.05's introductory

paragraph and Listing 12.05C's criteria.  *See Foster* 279 F.3d at 354; *Breitenstein v.*

*Astrue*, No. 3:10cv32, 2011 WL 1234902 (S.D. Ohio Mar. 30, 2011) (Rice, D.J.).  And,

in this case, it does.

*IQ Score*

Listing 12.05C requires a plaintiff to show "a valid verbal, performance, or full

scale IQ of 60 through 70 …." *Id.*  "In cases where more than one IQ is customarily

derived from the test administered, e.g., where verbal, performance, and full scale IQs are

provided in the Wechsler series, [the Social Security Administration] use[s] the lowest of

these in conjunction with 12.05." *Id.* § 12.00D(6)(c).

In the present case, the record contains the results of two separate intelligence

tests.  First, when Plaintiff was in school, she obtained a full-scale IQ of 64, verbal IQ of

62, and performance IQ of 71 on the Wechsler Intelligence Scale for Children (WISC-

III).  (Doc. #5, *Page ID* #s 642, 650).  The school psychologist, Stephanie Shafer, found

that those scores are consistent with past assessments (from 1991, 1993, 1994) that

indicated Plaintiff functioned in the "well below average range." *Id.* at 642.  And, at the

time of the assessment (1998), Plaintiff's teachers believed that she was still functioning

in the same range. *Id.*  The assessment further reveals that there was no severe

discrepancy between Plaintiff's WISC-III scores and her scores on the Wechsler

Individual Achievement Test (WIAT). *Id.* at 650. ALJ Hockensmith does not appear to contest the validity of these results. *Id.* at 88.

Many years later, in April 2014, Christopher Ward, Ph.D., administered the Wechsler Adult Intelligence Scale–Fourth Edition (WAIS-IV). *Id.* at 1702, 1705. Plaintiff obtained a full-scale IQ of 61, verbal-comprehension index of 68, and perceptual-reasoning index of 71. *Id.* There is, however, some question about the validity of these scores because Dr. Ward indicated, "Her tested IQ is lower than what would be expected on the basis of her clinical presentation. This was due to inconsistent effort and her generally tired presentation. Borderline Intellectual functioning is warranted based on her history and presentation." *Id.* at 1702. Dr. Ward later narrowed his opinion: "her testing scores were *slightly* lower than what would be expected." *Id.* (emphasis added).

Regardless of the validity of Plaintiff's WAIS-IV scores, her full-scale IQ of 64 and verbal IQ of 62 on the WISC-III falls into the range required by the Listing.

*Additional and Significant Work-Related Limitation*

Listing 12.05C also requires an individual to have "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. § 404, Subpt. P, App. 1, § 12.05C. The Regulations explain, "For paragraph [12.05]C, [the Social Security Administration] will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits [a claimant's] physical or mental ability to do basic work activities, *i.e.*, is a 'severe' impairment(s), as defined in … § 416.920(c)." *Id.* § 12.00A.

Accordingly, ALJ Hockensmith's determination that Plaintiff had several "severe" impairments[2] under § 416.920(c) effectively determined that the impairments imposed "additional and significant work-related limitation of function" in satisfaction of Listing 12.05C.

*General Intellectual and Adaptive Functioning*

The introductory paragraph of Listing 12.05 requires that an individual show "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *e.g.* the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. § 404, Subpt. P, App. 1, § 12.05.

In the present case, Plaintiff's IQ scores and school records demonstrate significantly subaverage general intellectual functioning that began during her developmental period. When she was in school, she obtained a full-scale IQ of 64, verbal IQ of 62, and performance IQ of 71 on the WISC-III. (Doc. #5, *PageID* #642); *see West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 698 (6th Cir. 2007) ("the claimant *may* use a qualifying IQ score before the age of 22 to demonstrate that his subaverage intellectual functioning initially manifested during his developmental period ….") (citing *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 873 (6th Cir. 2003)). The school psychologist, Stephanie Shafer, noted, "The Full Scale IQ of 64 falls more than 2 and 1/3 standard

---

[2] ALJ Hockensmith found that in addition to Plaintiff's borderline intellectual functioning, her severe impairments include residuals of left ankle fracture and corrective surgery, mild degenerative disc disease of the lumbar spine, affective disorder with depressive features, and generalized anxiety disorder. (Doc. #5, *PageID* #84).

deviations below the mean and places overall intellectual functioning in the range of mild mental retardation." (Doc. #5, *PageID* #642).

Likewise, on the WIAT, Plaintiff scored "severely below average" in basic reading, reading comprehension, math calculation, math reasoning, and written expression. *Id.* at 640, 650. Ms. Shafer indicated that, at age 20, Plaintiff's basic reading skills, spelling, and written expression were at a fourth-grade level. *Id.* at 640-41, 653. Her reading comprehension and math skills were at a mid-third-grade level. *Id.* at 640-41, 653. Further, her skills in reading, writing, and math "exceed those of only approximately 1% of students her age." *Id.* at 641. Ultimately, Plaintiff qualified for "Special Education as a student with a Developmental Handicap." *Id.* at 651.

This evidence is consistent with more recent records. For instance, Plaintiff's WAIS-IV scores—verbal-comprehension index of 68, perceptual-reasoning index of 71, and full-scale IQ of 61—are consistent with her previous WISC-III scores—verbal IQ of 62, performance IQ of 71, full-scale IQ of 64. *Id.* at 642, 1705. Although Dr. Ward found that her WAIS-IV scores were slightly lower than what was expected, he nevertheless concluded that Plaintiff's "general level of intelligence appeared to fall below normal limits." *Id.* at 1701.

Plaintiff's testimony is also consistent with the records. She disclosed that she struggles with reading and writing: "I can't spell a lot of my words." *Id.* at 124. And, "a lot of people have to read a lot of the stuff to me." *Id.* She has similar difficulties in math: "I can add and subtract, but I have trouble with subtracting on sometimes…. I can't times or divide at all." *Id.* at 125. At work, Plaintiff "sometimes" has trouble

reading the parts and part numbers. *Id.* at 125-26. Her friends have to help her at work about three times a week. *Id.*

Together, this evidence demonstrates Plaintiff has significantly subaverage general intellectual functioning that manifested during her developmental period.

Plaintiff's records also reveal deficits in adaptive functioning initially manifested during her developmental period. "Deficits in adaptive functioning … refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 37 (Am. Psychiatric Ass'n, 5th ed. 2013) (DSM-5). An individual demonstrates deficits in adaptive functioning consistent with intellectual disability "when at least one domain of adaptive functioning—conceptual, social, or practical—is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." *Id.* at 38.

Looking first at the practical domain—it "involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others." *Id.* at 37. ALJ Hockensmith's discussion of deficits in adaptive functioning focuses primarily on the practical domain. He noted that Plaintiff performed semi-skilled work in the past. Further, she is able to live independently and "has sufficient mental acuity to operate a motor vehicle and to otherwise function adequately in the performance of regular and routine daily activities." (Doc. #5, *PageID* #s 89, 92-96).

ALJ Hockensmith is correct that Plaintiff is capable of some personal care and household tasks—albeit with limitations. For instance, she is able to drive but not on highways unless it is necessary. *Id.* at 122. She can do household chores *if* she is not hurting. *Id.* at 133. Dr. Ward noted that she is able to attend to her grooming and hygiene, go shopping, prepare basic meals, interact with her children, and have some contact with her neighbors. *Id.* at 1701.

However, the record also reveals that Plaintiff struggles with banking and money management. Her husband pays the household bills because she has made mistakes in the past. *Id.* at 132-33. He has to remind her to take her medications. *Id.* Further, Plaintiff relies heavily on her case manager, Laura Long, for help filling out forms and understanding letters. *Id.* at 139-40.

But even if Plaintiff did not rely on her husband or case manager, Plaintiff's activities are not inconsistent with an intellectual disability. In *Brown v. Secretary of Health and Human Services,* the plaintiff was able to use public transportation, make change at the grocery, do his own laundry, and clean his room (activities similar to Plaintiff's in this case). 948 F.2d 268, 270. Additionally, like Plaintiff, he had a limited level of reading comprehension and had a driver's license. *Id.* And, when he was employed as a truck driver, he was able to record mileage, the hours he worked, and the places he drove. *Id.* The Sixth Circuit found that these activities were not inconsistent with a valid I.Q. of 68 . . . ." *Id.* The Court explained that the plaintiff's activities "fit[] squarely within the DSM-III-R profile of a mildly retarded individual":

"By their late teens *they can acquire academic skills up to*

> approximately sixth-grade level; during their adult years, they
> usually achieve social and vocational skills adequate for
> minimum self-support, but may need guidance and assistance
> when under unusual social or economic stress. At the present
> time, virtually all people with Mild Mental Retardation can
> live successfully in the community, independently or in
> supervised apartments or group homes (unless there is an
> associated disorder that makes this impossible)."

Id. at 270 (quoting DSM-III-R § 317.00).

The (most recent) DSM-5 indicates that, in the practical domain, a person with a

mild intellectual disability "may function age-appropriately in personal care" but will

"need some support with complex daily living tasks in comparison to peers … [such as]

grocery shopping, transportation, home and child-care organizing, nutritious food

preparation, and banking and money management."  DSM-5 at 34.  In comparison, a

person with a moderate intellectual disability "can care for personal needs involving

eating, dressing, elimination, and hygiene as an adult, although an extended period of

teaching and time is needed for the individual to become independent in these areas, and

reminders may be needed."  Id. at 35.  Likewise, "participation in all household tasks can

be achieved by adulthood, although an extended period of teaching is needed, and

ongoing supports will typically occur."  Id.

There are notable similarities between Plaintiff's activities in this case and the

plaintiff's activities in Brown.  For example, they can drive, make change at the grocery,

do laundry, and clean.  They both have a limited ability to read and both have a driver's

license.  Further, as defined by the DSM-5, their limited activities are not inconsistent

with mild (or moderate) intellectual disability.

ALJ Hockensmith found that Plaintiff's ability to perform semi-skilled jobs inconsistent with her purported intellectual deficits. (Doc. #5, *PageID #*93). But, a person's ability to perform unskilled or semi-skilled work is not necessarily inconsistent with having a mild intellectual disability. *See Brown*, 948 F.2d at 270 (finding that work as truck driver—including recording mileage, hours, and places—is not inconsistent with mild intellectual disability); *Whitehead*, No. 13-1231-T, 2014 WL 3952839, at *5 ("Plaintiff's past relevant work was classified as heavy, semi-skilled work. … [N]either sawing trees or loosening and tightening wheel lug nuts suggests intellectual capacity beyond that found by the psychologists who … concluded that he met the diagnostic criteria for mild mental retardation."). The DSM-5 indicates that an individual with a mild disability is capable of employment but generally needs support to learn a skilled vocation competently and "competitive employment is often seen in jobs that do not emphasize conceptual skills." DSM-5 at 34. And, an individual with moderate intellectual disability can achieve "[i]ndependent employment in jobs that require limited conceptual and communication skills …, but considerable support from ... others is needed to manage social expectations, job complexities, and ancillary responsibilities such as scheduling, transportation, health benefits, and money management." *Id.* at 35.

However, when an individual's semi-skilled work includes complex or complicated tasks, it is more likely that the individual's ability to work is inconsistent with a finding of mild intellectual disability. *See Carmack v. Barnhart*, 147 F. App'x 557, 560–61 (6th Cir. 2005) (finding that a claimant's work history—including owning a tanning salon, selling the tanning beds, and working as a court reporter—"belies her

claim of mental retardation.").

In the past fifteen years, Plaintiff has had two semi-skilled jobs that constitute substantial gainful activity—home-health aide and cashier/checker. (Doc. #5, *PageID* #s 101, 146). ALJ Hockensmith does not identify any complicated or complex tasks required by Plaintiff's past jobs.

At the time of the hearing, Plaintiff worked as a product assembler—an unskilled position. *Id.* at 146. Although her job constitutes substantial gainful employment, it is not necessarily proof that Plaintiff was able to work during the time between her application date and first day of her new job.

Since Plaintiff began working in January 2016, she missed ten days in the first three months she worked and missed five days in the fourth month. *Id.* at 128. She was told if she missed one more day, she would be fired. *Id.* Charlotte Ewers, a vocational expert, testified that it is "highly unusual" for an employer to keep an employee that missed so many days and that person would likely be terminated at another job. *Id.* at 148. Ms. Ewers further testified that Plaintiff's employment "could very well be that she's in a placement program with a particular agency, and they have some type of signed contract with them. I don't know that for sure. But if they're aware that she has a case manager, and if that case manager has any intervention at that place of business, then it would be subsidized employment." *Id.* at 150.

Further, Plaintiff is not able to complete her work by herself. She testified that she gets a lot of help with her job duties from two of her co-workers. *Id.* at 126, 130-31. About three times a week, her co-workers make sure she has the right parts. *Id.* at 126.

They also help her "keep caught up on [her] parts" because her supervisor yelled at her all the time. *Id.* at 131, 136. Even in looking for a job, she required help. Ultimately, she got the job through a neighbor. Before that, her case manager had to help her fill out applications, drive her around, and call potential employers. *Id.* at 131.

Ms. Long noted that since Plaintiff has been employed, her problems have gotten a little worse. Plaintiff was "much more volatile and agitated and irritable." Ms. Long suggested that the additional stress from work may be the cause of this change. *Id.* at 142. Further, Plaintiff has reported to her that, on several occasions, she has gotten frustrated and yelled/cussed at her supervisors or employees. *Id.* The symptoms described by Ms. Long mirror Dr. Ward's opinions: "The claimant described depressive symptoms that may compromise [her] ability to respond to work pressures and lead to increased emotional instability and conflicts." *Id.* at 1704. Likewise, "[her] anxious symptoms [] may compromise ability to respond to work pressures and lead to increased likelihood of agitation and difficulties with breathing." *Id.*

Looking next to the conceptual (academic domain)—it "involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others." DSM-5 at 37. The academic records discussed above indicate Plaintiff had deficits in the "conceptual (academic) domain" as a student. For example, based on the results of a multifactored evaluation in 1998, the evaluation team (including the Option-4 Coordinator, the Assistant Principal, and the School Psychologist) concluded that "[Plaintiff's] *significant deficits* in intellectual functioning, academic performance, and adaptive behaviors are

significantly impeding her educational performance." (Doc. #5, *PageID* #654) (emphasis added). Further, "Deficits in overall intellectual ability, adaptive behavior skills, academic achievement would have a negative effect on [Plaintiff's] classroom progress." *Id.* at 653. The school psychiatrist, Ms. Shafer, indicated, "[she] may experience difficulty in keeping up with [her] peers in a wide variety of situations that require age appropriate thinking and reasoning abilities." *Id.* at 642.

Dr. Ward's assessment is consistent with those academic records. As noted in more detail above, for instance, Plaintiff's WAIS-IV IQ scores are consistent with her WISC-III scores. Dr. Ward noted, "Her remote recall was marginally adequate for completion of historic examination information." *Id.* at 1701. She only calculated three iterations of serial sevens in thirty seconds. *Id.* Plaintiff's performance on a verbal reasoning test, a working memory test, and a processing speed test suggests that she has difficulty understanding and remembering instructions. *Id.* at 1703. Despite Dr. Ward's indication that Plaintiff's IQ testing scores were "slightly lower than what would be expected," he concluded, "Ms. Beam functions in the below average range from an intellectual functioning perspective based on her clinical presentation and testing results." *Id.* at 1702-03.

Together, this evidence shows Plaintiff's significantly subaverage intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period as Listing 12.05C requires.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[3]

**B.      Remand**

Remand is warranted when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand for an ALJ's failure to follow the regulations might arise, for example, when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff's credibility lacking, *Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted "only where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is

---

[3] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

lacking." *Felisky*, 35 F.3d at 1041 (quoting *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)).

In the present case, the evidence of record establishes that a remand for award of benefits is warranted because the record contains overwhelming evidence, or strong evidence while contrary evidence is lacking, that Plaintiff met the criteria of Listing 12.05C.

**IT IS THEREFORE ORDERED THAT**:

1. The Commissioner's non-disability finding is **REVERSED**;

2. This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for payment of benefits consistent with the Social Security Act; and

3. The case is terminated on the Court's docket.

September 17, 2019

*s/Sharon L. Ovington*
Sharon L. Ovington
United States Magistrate Judge